**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Case No. 24-cr-169-JEB** |
| | : | |
| **ISABELLA MARIA DELUCA,** | : | |
| | : | |
| **Defendant.** | : | |

**UNITED STATES' MEMORANDUM REGARDING REVIEW OF THE
MAGISTRATE JUDGE'S DENIAL OF SEARCH WARRANT APPLICATION**

Pursuant to the Court's June 4, 2024 ruling in the above-captioned matter, the United States respectfully submits this request for review of the March 27, 2024 memorandum opinion issued by Magistrate Judge Autumn Spaeth of the U.S. District Court for the Central District of California (hereinafter, "the Opinion"). In that Opinion, Magistrate Judge Spaeth held that the government failed to establish probable cause that evidence of the target offenses would be found in the locations to be searched. Ex. A at 2.[1] Although the warrants to search the defendant's person and apartment in California are now moot, the government maintains that there was and remains probable cause to search the defendant's cell phone (the "Target Device").

First, the Opinion fails to account for several specific facts that bear directly on probable cause. The defendant used her cell phone multiple times on January 6, 2021 to film rioters inside the U.S. Capitol looting an office and stealing furniture. The defendant climbed through a broken window, passed a table through a different broken window, and used her phone to film the scene. Rioters passed the table in the direction of the Lower West Terrace Tunnel, where it was used as a weapon against law enforcement officers defending the U.S. Capitol. The government has also

---

[1] "Ex. A." refers to Exhibit A attached hereto, *i.e.*, Magistrate Judge Spaeth's March 27, 2024 memorandum opinion.

learned that (i) the phone used by the defendant on January 6 is an Apple iPhone and (ii) the defendant has an Apple iCloud account allowing her to transfer digital data between devices, including the Target Device. The Opinion's reasoning about the transferability of data across the defendant's devices was incorrect. The government has therefore established a fair probability that evidence of the charged offenses will be found on the Target Device; it need not establish a near-certain probability as the Opinion suggests. Because the government has satisfied the requirements of the Fourth Amendment, this Court "must" issue the search warrant under Federal Rule of Criminal Procedure 41(d)(1).

Second, the Opinion appears to be an anomaly as one of the only courts in the nation to write that evidence from January 6, 2021 is "impermissibly stale and tenuous," Ex. B at 14,[2] a finding which contradicts hundreds, if not thousands, of successful search warrants approved by courts across the country in connection with the January 6 investigation over the last three years. The Opinion concludes that the government's evidence is stale without accounting for the very evidence addressing staleness—a detailed discussion of recent searches that continued to yield evidence of the conduct on January 6, 2021. And the Opinion did not even address the legal factors underlying the staleness doctrine, including how the passage of time does not necessarily render digital evidence stale.

Third, the Opinion is premised on the lack of probable cause in the Central District of California. But concerns about the defendant's temporary travel to California are no longer present because the Target Device is now in the possession of law enforcement in Washington, D.C., where there is a direct nexus to both the defendant and the charged offenses.

---

[2] "Ex. B" refers to Exhibit B attached hereto, *i.e.*, the search warrant for the target device in the Central District of California, which has been unsealed in its entirety.

This Court should therefore reject the conclusions of law and fact in Magistrate Judge Spaeth's Opinion and issue the requested warrant because it complies with the Fourth Amendment and Federal Rule of Criminal Procedure 41.

## FACTUAL AND PROCEDURAL BACKGROUND

**A. The Defendant's Arrest on Charges Stemming from the Riot at the U.S. Capitol on January 6, 2021.**

On January 6, 2021, a riot at the U.S. Capitol interrupted the certification of the 2020 presidential election. The defendant, Isabella Maria DeLuca, participated in that riot. Around 4:24 p.m., DeLuca, who had breached the Capitol's restricted area, arrived at the temporary inaugural platform constructed on the Lower West Terrace of the U.S. Capitol. *See* Ex. C ¶ 39;[3] *In the Matter of the Search of One Digital Device Currently Located at 601 4th Street NW, Washington, DC Under Rule 41*, No. 24-SW-91 (GMH) (D.D.C. Mar. 28, 2024), ECF No. 1-4 ¶ 46. From there, DeLuca continued to descend the inaugural platform. *Id.* ¶ 47. Around 4:30 p.m., DeLuca arrived in an area near the Lower West Terrace Tunnel (the "Tunnel") and outside of Senate Terrace Room 2 Mezzanine ("ST-2M"), a hideaway office used by members Congress and their staffs. *Id.* Although ST-2M was unoccupied on January 6, it is considered a sensitive location that is not open to members of the public. *Id.* For the next several minutes, DeLuca used her cell phone to record video and/or take photographs outside of ST-2M, witnessing rioters inside the room steal pieces of furniture, including a lamp and a chair, and passing them to the rioters outside. Ex. C ¶ 41; 24-SW-91, ECF No. 1-4 ¶ 48. DeLuca then entered ST-2M through a broken window and passed a table out of another broken window. Ex. C ¶¶ 42-43; 24-SW-91, ECF No. 1-4 ¶¶ 49-50. As DeLuca continued to use her cell phone to film, rioters passed the table in the direction of the

---

[3] "Ex. C" refers to Exhibit C attached hereto, *i.e.*, the affidavit in support of the search warrant for the target device in the Central District of California, which has been unsealed in its entirety.

Tunnel where it was used as a weapon to assault law enforcement officers. Ex. C ¶¶ 44, 48; 24-SW-91, ECF No. 1-4 ¶¶ 51, 55.

On February 28, 2024, U.S. Magistrate Judge Robin M. Meriweather of the U.S. District Court for the District of Columbia issued a warrant for the arrest for DeLuca, finding probable cause that she violated 18 U.S.C. §§ 641, 2 (theft of government property and aiding and abetting theft of government property), 18 U.S.C. § 1752(a)(1) (entering or remaining in restricted buildings or grounds), 18 U.S.C. § 1752(a)(2) (disorderly and disruptive conduct in a restricted building or grounds), 40 U.S.C. § 5104(e)(2)(D) (disorderly or disruptive conduct in the Capitol Buildings), and 40 U.S.C. § 5104(e)(2)(G) (parading, demonstrating, or picketing in a Capitol Building). *See United States v. DeLuca*, No. 24-cr-00169, ECF No. 1.

Magistrate Judge Meriweather also found probable cause to issue a Rule 41 search warrant for DeLuca's person and apartment in Washington, D.C., including any digital devices containing evidence of the riot at the U.S. Capitol on January 6, 2021. *See* 24-SW-91, ECF No. 1-4.[4] This search warrant specifically covered the Target Device—DeLuca's current cell phone (*see id.* ¶ 73; Ex. C ¶ 71)—which is the subject of the above-captioned search warrant. In support of probable cause, the 61-page affidavit established, among other things, that DeLuca was in possession of a cell phone at the time of the offenses on January 6, 2021. Specifically, DeLuca used her cell phone on January 6, 2021, to make calls originating from Alexandria, Virginia, where her hotel was located, and from several locations in Washington, D.C. near the U.S. Capitol. Ex. C ¶ 65; 24-SW-91, ECF No. 1-4 ¶ 72. DeLuca also used her cell phone multiple times during the commission of the offenses, including to record video and/or take photographs outside of ST-2M as rioters looted

---

[4] *See also In the Matter of the Search of One Premises and One Person Including Any and All Digital Devices Owned, Used, or Controlled by that Person Under Rule 41*, No. 24-SW-055 (D.D.C.), ECF No. 2.

the office. Ex. C ¶¶ 40-44; 24-SW-91, ECF No. 1-4 ¶¶ 47-51. DeLuca further used social media on her cell phone to communicate with others about her travel to Washington, D.C. and the events at the Capitol on January 6, 2021. Ex. C ¶¶ 35-37, 50-55; 24-SW-91, ECF No. 1-4 ¶¶ 41, 42-43, 57-62.

Before executing the arrest and search warrants, the Federal Bureau of Investigation ("FBI") learned that DeLuca had recently traveled from Washington, D.C. to Irvine, California, where she was staying with another individual. While law enforcement investigated DeLuca's whereabouts, the search warrant expired on March 12, 2024. The government resubmitted the search warrant with minor amendments and Judge Meriweather reissued it on March 13, 2024.[5] The FBI executed the search warrant at DeLuca's apartment on March 15, 2024, seizing two Apple iPhones, but not the Target Device.

Meanwhile, to locate and arrest DeLuca, the government obtained a search warrant for historical and prospective cell site location information on the Target Device.[6] Upon confirming that DeLuca was staying with another individual at an apartment in Irvine, California, the FBI planned to arrest DeLuca at the apartment on March 15, 2024. The FBI planned on lawfully seizing any digital devices incident to arrest and transporting them back to the FBI's Washington Field Office, the primary agency leading the investigation of DeLuca, who also resides in Washington, D.C. The government nonetheless sought a search warrant for the Target Device in the U.S. District Court for the Central District of California. *See* Exs. B, C. This warrant would have

---

[5] *See* 24-SW-055, ECF No. 6.

[6] *See In the Matter of the Search of the Monitoring of Global Positioning System Information and Cell Site Location Data for One Cell Phone Account Stored at Premises Controlled by One Provider and Search of Information Associated with These Numbers Pursuant to 18 U.S.C. §§ 2703 and 3123 for Investigation of Violation of 18 U.S.C. § 641*, No. 24-SC-465 (D.D.C.), ECF No. 4.

enabled to government to begin the search of the phone, including data extraction, immediately. The government also sought warrants to search DeLuca's person and to search the premises where DeLuca was staying in the event she was arrested and left the Target Device in the apartment. Those search warrants were substantially similar to the warrants submitted to, and signed by, Judge Meriweather on February 28 and March 13. The only difference was additional information on DeLuca's travel to, and location in, the state of California. *See* Ex. C ¶¶ 72-78.

On March 14, 2024, U.S. Magistrate Judge Autumn Spaeth of the U.S. District Court for the Central District of California denied the search warrants in their entirety. The government sought explanation to try to remedy any infirmity. Based on operational concerns, the FBI arrested DeLuca the next morning. She was arrested in a common area of the apartment building as she was retrieving a package. The FBI lawfully seized the Target Device on her person incident to arrest and transported it to the FBI's Washington Field Office, where it is currently stored.

**B. The Magistrate Court's Opinion in the Central District of California.**

Almost two weeks later, on March 27, 2024, Magistrate Judge Spaeth issued a memorandum decision denying the search warrants, including a warrant for the Target Device. In that Opinion, the court held that the government failed to establish probable cause that evidence of the target offenses would be found on any of DeLuca's cell phones. *See* Ex. A at 2. Without discussing any of the relevant factors underlying the staleness doctrine, the Opinion characterized the government's evidence as "impermissibly stale and tenuous" because "[m]ore than three years have passed since the alleged crimes occurred and Defendant is no longer using the same phone." *Id.* at 14. The Opinion even went so far to suggest that evidence from three years ago is categorically stale and cannot support a warrant "due to the limited likelihood that any cell phone discovered would still contain evidence of the crime." *Id.* at 18. In doing so, however, the court

focused on the existence of probable cause in California, finding "no reason to believe evidence of an event that occurred over three years ago in Washington, D.C. would have been transported across the country to the location to be searched." *Id.* at 2. Indeed, the Opinion emphasized that "[t]he facts provided to the Court merely suggest that Defendant is visiting the area" and that "there is no evidence" that the digital devices "still exist" or are "in Defendant's possession in California." *Id.* at 9, 15.

Magistrate Judge Spaeth's concerns about a geographic nexus between the crimes and the items to be searched—although misplaced from the government's perspective—have since become moot. The Target Device is now in the possession of the FBI in Washington, D.C., where there is a direct nexus to both the defendant and the charged offenses.

### C.  Subsequent Proceedings in the District of Columbia.

By the time Magistrate Judge Spaeth issued her Opinion, the Target Device was already in the custody of the FBI in Washington, D.C. and the government had already filed a new search warrant application in the District of Columbia. *See* 24-SW-91, ECF No. 1-5. In that application, the government disclosed that the Magistrate Court had denied the California application for a warrant to search the Target Device. *Id.* ¶ 21. The government also offered to provide copies of the denied warrant package to the court, which it later did at the request of the court. The application was assigned to Magistrate Judge Harvey and submitted by email on March 20, 2024. Magistrate Judge Harvey directed the government to file the same application with a supporting memorandum of law on the docket (see 24-SW-91, ECF No. 1-1), which the government did on March 28, 2024. The application incorporates by reference the statement of facts in the above-captioned case and the search warrant approved by Magistrate Judge Meriweather on March 13. *See* 24-SW-91, ECF Nos. 1-3, 1-4.

Although the application submitted to Magistrate Judge Harvey is similar, it is *not* identical to the one granted by Magistrate Judge Meriwether or the one denied by Magistrate Judge Spaeth. The application assigned to Magistrate Judge Harvey included additional facts that strengthen the government's showing of probable cause that evidence of the crimes charged will be found on the Target Device:

- First, based on financial records, the defendant pays for Apple iCloud storage, which would allow her to transfer data seamlessly from one Apple device to another, including the Target Device. *See* 24-SW-91, ECF No. 1-5 ¶ 27.

- Second, the application explains that the FBI recovered two Apple iPhones at the defendant's apartment in Washington, D.C.—one of which is likely the phone the defendant possessed on January 6, 2021[7]—further suggesting the routine capability to transfer data across Apple devices, including the Target Device. *See* 24-SW-91, ECF No. 1-5 ¶ 11. These two facts were not presented in the application before Judge Spaeth, who articulated concerns about the transferability of data across devices. *See* Ex. A at 16. In fact, Judge Spaeth's concerns about whether the device used on January 6 still existed or was even an Apple product turned out to be mistaken. *Id.* at 15-16.

- Third, since submitting the application in the District of Columbia, the government confirmed through legal process that the defendant has possessed an iCloud account since May 2018, to which she has registered several devices including an Apple iPhone 14 Plus,

---

[7] One of the phones recovered is an Apple iPhone SE. The other phone recovered is an Apple iPhone in a pink case, but it is too badly damaged to be charged or powered on. This is likely the iPhone the defendant possessed on January 6, 2021, because it appears to be the same phone in a pink case that the defendant can be seen using in the footage and photographs reproduced in the affidavit. *See* Ex. C, Images 5, 6, 7, 10, and 12.

matching the Target Device.[8]

In short, the government provided additional evidence showcasing probable cause that evidence of a crime would likely be found on the Target Device in question.

On May 14, 2024, Magistrate Judge Harvey issued his memorandum opinion denying the search warrant application in the District of Columbia on May 14, 2024. *See In the Matter of the Search of One Digital Device Currently Located at 601 4th Street NW, Washington, DC Under Rule 41*, No. 24-SW-91 (GMH), 2024 WL 2152740 (D.D.C. May 14, 2024). In that opinion, Magistrate Judge Harvey did not address whether the government's search warrant established probable cause to search the Target Device. Instead, citing cases outside of the search warrant context, the Magistrate Court relied on "principles important to the orderly functioning of the courts" to create a rule that, "when the government has presented an application for a search warrant to one magistrate judge and it has been denied, it cannot then present a substantially similar application for the same target property to a different magistrate judge in the hope of a better outcome." *Id.* at *5.

Pursuant to Local Rule 59.3 and 28 U.S.C. § 636(b)(3), the government timely appealed Magistrate Judge Harvey's decision to this Court in its capacity as Chief Judge on May 28, 2024. *See* 24-SW-91, ECF No. 9. This Court held a hearing on June 4, 2024. In an oral ruling, the Court explained that it would review Magistrate Judge Spaeth's opinion directly and deny as moot the government's request for review of Magistrate Judge Harvey's opinion.

## <u>JURISDCTION AND VENUE</u>

This Court has jurisdiction under 18 U.S.C. § 3231 and venue is proper under Federal Rules

---

[8] At the June 4 hearing, this Court ruled that the government would be able to proffer these additional facts in support of probable cause in its appeal of Magistrate Judge Spaeth's Opinion.

of Criminal Procedure 18 and 41(b)(1).[9]

## STANDARD OF REVIEW

The Federal Magistrates Act distinguishes between two categories of matters that a district judge may refer to a magistrate judge and additional duties that may be assigned to a magistrate judge. Under 28 U.S.C. § 636(b)(1)(A), a district judge may refer to a magistrate judge for determination any pretrial matter, except for specified types of dispositive motions. Under § 636(b)(1)(B), a district judge may refer a matter to a magistrate judge to conduct hearings, including evidentiary hearings, and to submit to the court proposed findings of fact and recommendations for the disposition of the "excepted" motions specified in § 636(b)(1)(A). A district judge reviews a magistrate judge's decision on any pretrial matter under § 636(b)(1)(A) to determine whether it is "clearly erroneous or contrary to law." Fed. R. Crim. P. 59(a). And a district judge reviews *de novo* only those portions of the magistrate judge's report or recommendation to which objection is made under § 636(b)(1)(A). *See* Fed. R. Crim P. 59(b)(3).

There is also a catch-all provision under § 636(b)(3) providing that "[a] magistrate judge may be assigned such additional duties as are not inconsistent with the Constitution and laws of the United States." Because the search warrant application is not "referred" by a district court judge within the meaning of § 636(b)(1)(A) or § 636(b)(1)(B), Magistrate Judge Spaeth's denial "is best understood as an exercise of the magistrate judge's 'additional duties' jurisdiction pursuant to § 636(b)(3)." *In re Search of Information Associated with [Redacted]@gmail.com that is Stored at Premises Controlled by Google, Inc.*, No. 16–MJ–00757 (BAH), 2017 WL 3445634, at *4(D.D.C. July 31, 2024). The majority of courts to consider the standard of review under §

---

[9] Alternatively, venue may be proper under Rule 41(b)(3). *See In the Matter of the Search of One Apple iPhone Smartphone*, 628 F. Supp. 3d 155, 164-65 (D.D.C. 2022).

636(b)(3) have accorded *de novo* review. *See id.* at \*4 (citing cases); *see also In the Matter of the Search of Twenty-Six Digital Devices and Mobile Device Extractions*, No. 21-sw-233 (BAH), 2022 WL 998896, at \*6 (D.D.C. Mar. 14, 2022).

## ARGUMENT

For the reasons stated in its brief appealing Magistrate Judge Harvey's opinion (see 24-SW-91, ECF No. 9), the government maintains that this Court should reverse that opinion and issue the requested warrant. Courts have consistently held that the Fourth Amendment "does not prohibit the government from seeking a second magistrate's approval to search when another magistrate denies a search warrant." *United States v. Pace*, 898 F.2d 1218, 1230 (7th Cir. 1990). The only relevant determination for Fourth Amendment purposes is whether the application before the Court at that time supports probable cause to search the digital device and states with particularity the things to be searched. If so, the magistrate judge "must" issue the warrant under Federal Rule of Criminal Procedure 41(d)(1). By failing to evaluate the government's application for probable cause, and imposing freestanding "principles important to the orderly functioning of the courts" on the warrant requirement, Magistrate Judge Harvey committed reversible error.

Consistent with this Court's ruling on June 4, 2024, however, the government alternatively submits that Magistrate Judge Spaeth's Opinion should be rejected. This Court should issue the requested search warrant for the reasons explained below.

## I.   This Court's Authority to Review a Magistrate Judge's Opinion in Another District.

As a threshold matter, this Court's review of a magistrate judge's determination in a different district presents a nuanced question. Under the Federal Magistrates Act, a district judge necessarily retains decisionmaking authority over the exercise of a magistrate judge's "additional duties" powers under 28 U.S.C. § 636(b)(3). *See United States v. Raddatz*, 447 U.S. 667, 681

(1980) (recognizing that Congress addressed concerns of appointing non-Article III officers with judicial authority by requiring "the magistrate to act subsidiary to and only in aid of the district court" and noting that "the entire process takes place under the district's total control and jurisdiction"); *Mathews v. Weber*, 423 U.S. 261, 270 (1976) (recognizing that Congress made clear that "[a] district judge would retain ultimate responsibility for decision making in every instance in which a magistrate might exercise additional duties jurisdiction"); *Colorado Bldg. & Const. Trades Council v. B.B. Andersen Const. Co.*, 879 F.2d 809, 811 (10th Cir. 1989) ("[W]e have consistently recognized that a magistrate exercising 'additional duties' jurisdiction remains constantly subject to the inherent supervisory power of the district judge and the judge retains the ultimate responsibility for decision making in every instance" (internal quotation marks omitted)). Thus, magistrate judges are necessarily subordinate to district judges to avoid Article III and separation-of-powers issues.

In *United States v. Brigham*, 569 F.3d 220 (5th Cir. 2009), for example, the Fifth Circuit held that a district judge has inherent authority to review a magistrate judge's probable cause determination under Federal Rule of Criminal Procedure 32.1(c). To hold otherwise, the Fifth Circuit reasoned, "would be constitutionally problematic" and "impermissibly interfere with the district court's Article III obligations and power relative to sentencing, supervision of persons serving those sentences, and revocation of supervised release when appropriate." *Id.* at 227, 229. Indeed, the government "could repeatedly suffer dismissal by a non-Article III magistrate judge without any consideration by the judicial officer constitutionally charged with responsibility for that criminal proceeding." *Id.* at 229; *see also United States v. Saldana-Beltran*, 37 F. Supp. 3d 1180, 1185 (S.D. Cal. 2014) (holding that a district court has "general supervisory authority" to review identity and transfer orders under Rule 5 by a magistrate judge despite "[n]o statute or rule

provid[ing] for a right of appeal to the district court"). The same logic applies to the denial of a search warrant application under Federal Rule of Criminal Procedure 41.

The Federal Magistrates Act does not, however, expressly provide procedures for objecting to a magistrate judge's exercise of her "additional duties" under § 636(b)(3).[10] And the Federal Magistrates Act's other provisions providing for review suggest that review must be by a judge of the district court that appointed the magistrate. *See* 28 U.S.C. § 636(b)(1)(C) ("any party may serve and file written objections to such proposed findings and recommendations *as provided by rules of court*") (emphasis added); *id.* ("*A judge of the court* shall make a de novo determination of those proposed findings or recommendations") (emphasis added); *id.* ("*A judge of the court* may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate") (emphasis added). Unlike the Federal Magistrates Act, the Bail Reform Act expressly provides the court with original jurisdiction over the offenses to review the magistrate's decision in the arresting jurisdiction. *See* 18 U.S.C. § 3145.

Given the unique posture of this case, the government respectfully re-submits that this Court review Magistrate Judge Harvey's opinion, particularly given its possible impact. One reason, however, that it may be appropriate for this Court to review Magistrate Judge Spaeth's Opinion is that the property to be searched is now in the District of Columbia, not the Central District of California. This Court therefore has venue under Rule 41(b)(1), whereas a district judge in the Central District of California may lack venue and does not have original jurisdiction over the charged offenses.

---

[10] The appellate process for decisions by a magistrate judge is not well-established in the Central District of California. There is no equivalent to D.D.C. Local Criminal Rule 59.3. The undersigned has conferred with Assistant U.S. Attorneys in the Central District of California who generally understand that a magistrate judge's decision may be appealed to a district judge on criminal duty. That process, however, is not formalized.

II.   **The Warrant Establishes Probable Cause that Evidence of the Charged Offenses Will Be Found on the Target Device.**

This Court should reject the Opinion because it fails to account for several key facts that bear directly on probable cause. The Warrant Clause of the Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. The Supreme Court has long explained that the "precise and clear" words of the Warrant Clause require "only three things" for the issuance of a warrant: it must be issued by a neutral magistrate; it must be based on a showing of "probable cause to believe that 'the evidence sought will aid in a particular apprehension or conviction' for a particular offense"; and it must satisfy the particularity requirement. *Dalia v. United States*, 441 U.S. 238, 255 (1979); *see also Zurcher v. Stanford Daily*, 436 U.S. 547, 554 (1978). The government abundantly satisfies these elements here.

First, there is no dispute that this Court and Magistrate Judge Spaeth are neutral and detached judicial officers.

Second, Attachment A identifies with particularity the property to be searched; it is limited to one specific Target Device, describing its location and its make, model, and case. Ex. B at 5. And Attachment B identifies with particularity the items to be seized; it is limited to evidence related to the commission of the crimes charged. *Id.* at 6-8; *see United States v. Manafort*, 313 F. Supp. 3d 213, 232 (D.D.C. 2018) (holding that a warrant to search for documents was sufficiently particular where the categories of documents it identified related to specified offenses); *United States v. Ginyard*, 628 F. Supp. 3d 31, 48 (D.D.C. 2022) (citing *Manafort*). It further specifies the type of evidence that may be seized, to include, among other things, text messages, video, photographs, and social media, etc. from the narrow time period of November 3, 2020 to March

14

31, 2021. Ex. B at 6.

Third, a judge considering the warrant application must determine whether, in light of all the circumstances described in the supporting affidavit, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Here, the evidence before this Court establishes probable cause to believe that the information identified in Attachment B and located in the place described in Attachment A will constitute evidence of the charged crimes. The defendant possessed a cell phone while at the U.S. Capitol on January 6, 2021, using that device on multiple occasions to record video and/or take photographs. *See* Ex. C ¶¶ 40-44. Specifically, the defendant recorded video outside of ST-2M, witnessing rioters inside the room steal pieces of furniture, including a lamp and a chair, and passing them to the rioters outside. *Id.* ¶ 41. This video could provide evidence of the defendant's state of mind when she entered ST-2M through a broken window and did the exact same thing— stealing a table and passing it to rioters outside where it was subsequently used as a weapon against law enforcement officers. The defendant also used social media on that device to communicate with others about her travel to Washington, D.C. and the events at the U.S. Capitol on January 6, 2021. *Id.* ¶¶ 35-37, 50-55.

According to business records, the defendant has an Apple iCloud account, which would allow her to transfer messages, videos, and photographs seamlessly between her Apple devices, including the Target Device. 24-SW-91, ECF No. 1-5 ¶ 27. The FBI also recovered two Apple iPhones at the defendant's apartment in Washington, D.C.—one of which is likely the phone the defendant possessed on January 6, 2021 —further suggesting the routine capability to transfer data across Apple devices, including the Target Device. *Id.* ¶ 11. More recently, the government learned that the defendant has had an Apple iCloud account since 2018 and has registered the Target

Device to her iCloud account. These facts, along with the affiant's experience in January 6 cases, provide ample probable cause to believe a crime has been committed and that evidence of that crime will be found on the Target Device.

Accordingly, if this Court finds that the instant application complies with the requirements of the Fourth Amendment's Warrant Clause and Rule 41, then the Court must issue the search warrant as requested. *See* Fed. R. Crim. P. 41(d)(1); *see also Bank of Nova Scotia v. United States*, 487 U.S. 250, 255 (1988) ("federal courts have no more discretion to disregard [a] Rule's than they do to disregard constitutional or statutory provisions"). Judge Meriweather properly found that the government established these elements twice when she issued a similar search warrant on February 28 and reissued it on March 13. The government's search warrant application therefore complies with the requirements of the Fourth Amendment and with the provisions for issuing and executing search warrants in Rule 41.

The Opinion nonetheless faults the government for offering only "generalized" and "conclusory" statements in support of probable cause. Ex. A at 2, 16. But the court's analysis fails to account for the very facts described above that bear directly on probable cause. These facts also distinguish *United States v. Griffith*, 867 F.3d 1265 (D.C. Cir. 2017), which the Opinion cites repeatedly. Ex. B at 14-15, 17-18.

In *Griffith*, law enforcement obtained a warrant to search the apartment in which the defendant lived with his girlfriend and seize "all electronic devices" as evidence of the defendant's involvement in a homicide committed over a year earlier. *Id.* at 1270. But the supporting affidavit "offered almost no reason to suspect" that the defendant "in fact owned a cell phone, let alone that any phone belonging to him and containing incriminating information would be found in the residence." *Id.* at 1271. Indeed, when the officers sought the warrant in January 2013, the defendant

had just been released from prison in September 2012 after serving 10 months of incarceration on unrelated charges. As the D.C. Circuit explained, "[t]here was no observation of [the defendant] using a cell phone, no information about anyone having received a cell phone call or text message from him, no record of officers recovering any cell phone in his possession at the time of his previous arrest (and confinement) on unrelated charges, and no indication otherwise of his ownership of a cell phone at any time." *Id.* at 1272.

The boilerplate, ten-page affidavit in *Griffith* is a far cry from the 49-page affidavit here. *See* Ex. C. The affidavit explains, in detail, how the defendant used her cell phone repeatedly to (i) record video and/or take photographs of her criminal activity and (ii) communicate with others though social media about the events at the U.S. Capitol on January 6, 2021. It also explains how the defendant has the capability to transfer digital information to the target device. *See United States v. Smith*, No. 19-cr-324-BAH, 2021 WL 2982144, at *11 (D.D.C. July 15, 2021) (distinguishing *Griffith* because "law enforcement (1) knew that defendant owned a phone; (2) knew that he had used the phone to engage in in the relevant offense; and (3) knew based on experience that information relevant to the offense might be spread or shared across different devices").

Moreover, in *Griffith*, the D.C. Circuit observed that any phone found in the apartment would likely not contain incriminating evidence because "more than a year had elapsed since the shooting." 867 F.3d at 1274. The Opinion seizes on this fact, explaining that "a year gap between the commission of a crime and the request for a search warrant weighs against justifying a search." Ex. A at 18. But, again, this ignores the unique facts in *Griffith* where there was no evidence that the defendant "used a cell phone to communicate with his associates around the time of the crime" and the government merely assumed "that he continued to possess the same phone more than one

year later" despite being "confined for some ten months" during that period. 868 F.3d at 1274. Here, by contrast, the government is not making such assumptions. The evidence details the defendant's history of cell phone ownership and explains why there is reason to believe that the defendant can transfer messages, videos, and photographs seamlessly from one Apple device to another, including the Target Device.

### III.     The Opinion Also Erred in Concluding that the Government's Evidence is Stale.

The Opinion found that the government's evidence from 2021 and 2022 was "impermissibly stale and tenuous," and could not support probable cause that evidence of the charged offenses would be found on the target device. Ex. A at 14. The Opinion insinuates that evidence from three years ago is categorically stale and cannot support a warrant "due to the limited likelihood that any cell phone discovered would still contain evidence of the crime." *Id.* at 18. The Opinion fails to account for the government's evidence combatting staleness and failed to analyze the factors underlying the staleness doctrine. That was error.

The Opinion's concerns about staleness contradict hundreds, if not thousands, of search warrants approved by courts across the country in connection with the January 6 investigation over the course of the last three years.[11] The Opinion does not mention the affidavit's intentional and thorough discussion of searches that continue to yield the discovery of evidence—to this day—of the conduct on January 6, 2021. Ex. C, ¶ 80. To take just one example, as recently as February 8, 2024, the FBI searched a defendant's residence pursuant to a warrant and recovered digital devices with images taken on January 6. The Opinion nonetheless concludes that the government's evidence is stale without accounting for the very evidence in the affidavit addressing staleness.

---

[11] Indeed, to this day, the government continues to seek and receive judicial authorization for similar searches, premised on fulsome, detailed affidavit submissions. This Opinion calls these other authorizations into question without sufficient analysis.

Instead, the Opinion, in conclusory fashion, states that the government's evidence "is either seriously stale or is irrelevant." Ex. A at 6. But the Opinion does not even address the temporal considerations or other legal factors underlying the staleness doctrine.

The Opinion's categorical approach to staleness is not the law. "The law sensibly draws no bright-line rule for staleness." *Walczyk v. Rio*, 496 F.3d 139, 162 (2d Cir. 2007); *see United States v. Ali*, 870 F. Supp. 2d 10, 33 (D.D.C. 2012) ("In determining probable cause for the issuance of a search warrant, time alone, of course, is not controlling."). The question "is whether, at the time an affidavit is presented to a magistrate, it establishes probable cause that evidence will be found at the location of the search." *Ali*, 870 F. Supp. 2d at 33. In answering this question, courts consider "the nature of the criminal activity, the length of the activity, and the nature of the property to be seized." *Id.* (quoting *United States v. Harris*, 369 F.3d 1157, 1165 (10th Cir. 2004)). Where, as here, "the records or documents in question are digital, staleness is even less of a problem." *Id.* at 34. "[N]umerous courts have recognized that digital files remain on computers for extensive periods of time, even if they have been deleted," such that "the passage of time does not necessarily render the evidence stale." *United States v. Coon*, No. 10-cr-110A, 2011 WL 1871165, at *3 (W.D.N.Y. May 16, 2011) (citing cases). The Opinion fails to consider "the nature of digital evidence," which "weighs against a finding of staleness." *United States v. Payne*, 394 Fed. Appx. 891, 894 (3d Cir. 2010) (quoting *United States v. Payne*, 519 F. Supp. 2d 466, 477 (D.N.J. 2007)).[12]

The Opinion instead relies on the fact that the defendant has owned two phones, including

---

[12] The affidavit explains that forensic analysis may include techniques to scan "storage areas to discover and possibly recover recently deleted data." Ex. C ¶ 75(h)(ii). The affidavit in the District of Columbia also states that files on digital devices "can be recovered months or even may years after they have been downloaded" and that deleted files "can be recovered months or years later using readily available forensics tools." 24-SW-91, ECF No. 1-4 ¶ 80(c). Indeed, the ability to retrieve "an electronic file from a digital device depends less on when the file was downloaded or viewed than on a particular user's operating system" and "storage capacity." *Id.*

the Target Device, since possessing the phone used during the commission of the offenses on January 6, 2021. Specifically, the court declined "to infer that Phone 1 was transferred to Phone 2 and then to Phone 3, because some service providers have this ability and many people do it." Ex. A at 16. Based on the additional facts proffered by the government, however, the defendant has Apple iCloud storage, allowing her to transfer data seamlessly from one device to another, including the Target Device.[13] This alone strengthens what would already constitute probable cause based on the affiant's training and experience.

The Opinion further faults the government for failing to proffer "facts to show that Phone 1, used on the day of the alleged crimes, was an iPhone or even an Apple product." Ex. A at 16. Upon executing the search warrant at the defendant's apartment in Washington, D.C., the government learned that both recovered phones are, in fact, Apple iPhones—one of which is likely the phone the defendant possessed on January 6, 2021 (*i.e.*, Phone 1 in the Spaeth Opinion). That phone is in a pink case and appears to be the same one that the defendant can be seen using in the video footage and photographs from January 6, 2021, as explained above. Based on this information, and contrary to the Opinion's conclusion, the defendant's digital data appears to have been readily transferrable from Phone 1 to Phone 2, and then to Phone 3. In other words, the Opinion's concerns about the transfer of data to the Target Device were incorrect. Even if this Court were to review the facts at the time of Magistrate Judge Spaeth's original denial, the evidence still supports a reasonable inference (*i.e.*, likelihood) that the Target Device could have retained its evidentiary value. The affidavit establishes how, based on training and experience,

---

[13] *See* Apple iCloud+, https://www.apple.com/icloud/ ("iCloud is built into every Apple device. It keeps your photos, videos, notes, and more safe, automatically backed up, and available anywhere you go — with 5GB of storage for free. When you upgrade to iCloud+, you get even more storage along with enhanced privacy features that protect you and your data") (last visited June 10, 2024).

individuals "commonly transfer data from their previous phone" and "back up or preserve copies of digital media (such as photos and videos) across multiple devices to prevent loss." Ex. C ¶¶ 63, 64. This Court should therefore reject the Opinion's analysis of staleness and issue the requested warrant.

IV.     **The Opinion is Limited to the Existence of Probable Cause in California.**

This Court may distinguish the Opinion for one additional reason. The Opinion is primarily focused on the existence of probable cause in Irvine, California. In the Opinion, the Court repeatedly emphasized that "[t]he facts provided to the Court merely suggest that Defendant is visiting the area" and that "there is no evidence" that the digital devices "still exist" or are "in Defendant's possession in California." Ex. A at 9, 15. According to the Court, there was "no reason to believe evidence of an event that occurred over three years ago in Washington, D.C. would have been transported across the country to the location to be searched." Ex. A at 2. The Opinion's concerns about a geographic nexus between the crimes and items to be searched are now a moot issue. As explained above, the cell phone likely used on January 6 does, in fact, exist. It was seized at the defendant's apartment in Washington, D.C. pursuant to a search warrant. And the Target Device is now in the possession of the FBI in Washington, D.C., where there is a direct connection to the defendant and this Court's original jurisdiction over the charged offenses. Thus, the Opinion's concerns about the defendant's temporary visit to California are not present here, after the fact, when this Court evaluates probable cause *de novo*.

*   *   *

Ultimately, notwithstanding the government's specific objections, the Opinion misses the forest from the trees: probable cause is not, as this Court knows, a guarantee that a search will yield evidence. Instead, the "the task of evaluating probable cause [is] 'a practical, common-sense

21

decision whether, given all the circumstances set forth in the affidavit … there is a fair probability that contraband or evidence of a crime will be found.'" *United States v. Cardoza*, 713 F.3d 656, 659 (D.C. Cir. 2013) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Probable cause is a "fluid concept" and cannot be reduced to a "neat set of legal rules." *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018) (quoting *Gates*, 462 U.S. at 232). A showing of probable cause "is not a high bar," *id.* at 57, and in the context of a search warrant, only requires a "fair probability" that evidence of a crime will be found in a particular place, *see Matter of Search of Information that is Stored at Premises Controlled by Google LLC*, 579 F. Supp. 3d 62, 77 (D.D.C. 2021). "Probable cause does not require knowledge to a near-certainty." *Smith*, 2021 WL 2982144, at *13.

Here, the warrant establishes the basic facts that the defendant used a phone during a riot on January 6, 2021, and that a search of the phone may yield additional evidence related to that riot and the crimes alleged. The government has also marshalled additional facts about specific phones and the transferability of digital data to support the overall finding of probable cause. In other words, the government has provided a "substantial basis" to conclude that a search of the target device would uncover evidence of wrongdoing, and that a nexus exists between the item seized and the criminal conduct in question. *Griffith*, 867 F.3d at 1271. Nothing more is required.

## <u>CONCLUSION</u>

For these reasons, the government respectfully requests that this Court reject the conclusions of law and fact in Magistrate Judge Spaeth's Opinion and issue the requested search warrant.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY
DC Bar No. 481052

GREGORY P. ROSEN
ASSISTANT UNITED STATES ATTORNEY
CHIEF, CAPITOL SIEGE SECTION

By:     */s/ Jake E. Struebing*
         JAKE E. STRUEBING
         Assistant United States Attorney
         U.S. Attorney's Office for the District of Columbia
         601 D Street, N.W.
         Washington, DC 20530
         D.C. Bar No. 1673297
         (202) 252-6931
         Jake.Struebing@usdoj.gov

## CERTIFICATE OF SERVICE

I certify that, on June 12, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which sent notification to all counsel of record.

By:    _/s/ Jake E. Struebing_
JAKE E. STRUEBING
Assistant United States Attorney
601 D Street, N.W.
Washington, DC 20530
D.C. Bar No. 1673297
(202) 252-6931
Jake.Struebing@usdoj.gov